UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

REMO HARRISON DANIELS,

                        Plaintiff,

        v.                                        Case No. 17-cv-680-pp

BRIAN FOSTER, *et al.,*

                        Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 87) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 128)

The plaintiff is a Wisconsin state inmate and is representing himself. Magistrate Judge Nancy Joseph, who was assigned to the case at the time, screened the plaintiff's amended complaint and allowed him to proceed against the defendants on a claim that they violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs in the way they handled his medication and related overdoses on January 15, February 7, and March 11, 2017. Dkt. No. 45. The plaintiff filed a motion for summary judgment, dkt. no. 87, and the defendants filed a partial motion for summary judgment with respect to all but two of the defendants, dkt. no. 81. The court struck the defendants' motion (because the defendants combined it with their motion in another of the plaintiff's cases, Case No. 17-cv-681), and ordered that by August 21, 2019, they file separate motions in each case. Dkt. No. 120.

1

The defendants re-filed the motion as to this case only on August 30, 2019,[1]

dkt. no. 128, and the plaintiff has stated he would rely on his previously-filed

response to their motion, dkt. no. 126. The court will deny the plaintiff's

motion and grant in part and deny in part the defendants' motion.

## I.    FACTS

The plaintiff currently is an inmate at Green Bay Correctional Institution.

Dkt. No. 83 at ¶1. At the time of the events described in his complaint, the

plaintiff was incarcerated at Waupun Correctional Facility. Id. The plaintiff has

a complicated mental health history, which includes a history of threatening—

and engaging in—self-harm. Id. at ¶2. At his deposition, the plaintiff testified

---

[1] In its original scheduling order, the court set a deadline of October 10, 2018 for the parties to file summary judgment motions. Dkt. No. 57. The defendants asked the court to extend that and other deadlines, dkt. no. 67, and the court did so, extending the summary judgment deadline to November 19, 2018, dkt. no. 68. The defendants filed their joint summary judgment motion (the one the court struck) on November 19, 2018. Dkt. No. 81. As the court noted, it struck that motion, and required the defendants to refile a motion related to this case only by August 21, 2019. Dkt. No. 120 at 2. On August 21, the defendants asked the court to extend the deadline by one day, because defense counsel was preparing for trial in another case. Dkt. No. 121. The court granted that motion and extended the deadline to the end of the day on August 22, 2019. Dkt. No. 125. On August 22, 2019, the court received a document from the defendants, but it wasn't their summary judgment motion; it was the brief they'd filed in support of the motion the court had struck. Dkt. No. 122. Due to this apparent error, the court entered a text-only order, requiring the defendants to file their summary judgment motion by the end of the day on September 6, 2019. Dkt. No. 127. The court received the summary judgment motion on August 30, 2019. Dkt. No. 128. On September 4, 2019, the court received from the plaintiff a "motion to notice the court's of the defendant's miss the deadline." Dkt. No. 130. The plaintiff indicated that the defendants had missed the August 22, 2019 deadline, and asked the court to rule in his favor on that basis. Id. The court assumes that the plaintiff drafted his notice before he received the court's order extending the deadline for the defendants to file their motion until September 6, 2019. The defendants' August 30, 2019 motion was timely filed.

2

that he'd told one doctor that overdosing was his "go-to," and that when he gets frustrated and depressed, he overdoses. Dkt. No. 80 at transcript page 79, lines 15-18.

A.    Policies

For safety reasons, an officer is not allowed to enter (or attempt to enter) an inmate's cell without back-up assistance from other officers. Id. at ¶5. The defendants assert that it is impossible for an officer in the restricted housing unit (RHU) to "key open" a cell. Id. at ¶6. Typically, a supervising officer and two to four officers are present before entering an inmate's cell. Id. at ¶7. This is because the inmate could have a weapon, and because inmates need to be restrained before being escorted to another part of the institution. Id. In the event there is blood in the cell, the Health Services Unit (HSU) may have to be called before anyone enters the cell. Id. at ¶8. Sometimes there are delays because officers are unavailable due to escorting inmates or entering another cell. Id. at ¶9. These precautions are in place for both officers' and inmates' safety. Id. at ¶10.

With respect to observation status, there are two different levels: close and constant. Id. at ¶13. "Close" observation is the "standard" observation level and requires staff observation of inmates every fifteen minutes. Id. at ¶14. "Constant" observation is "one-on-one, continuous line-of-sight monitoring," requiring that an officer be assigned to a specific inmate for observation. Id. Decisions regarding an inmate's method(s) of observation and restraint lie with the professionals most qualified to diagnose and treat psychological conditions:

3

Psychiatric Services Unit (PSU) staff and physicians. Id. at ¶11. While any staff member may recommend that an inmate be placed on observation, the staff members specifically authorized to make the "ultimate decision" include psychologists, psychological associates, crisis intervention workers and wardens. Id. at ¶12.

"Constant observation is indicated when an inmate exhibits imminent suicidal behavior." Id. at ¶15. "Symptoms of imminent suicidal behavior include, but are not limited to: continued acts of self-harm despite being placed in a restrictive setting such as clinical observation status; access to object(s) that the inmate has on his person or finds in the cell;" or situations in which the inmate has a "significant history of engaging in violent self-harm behaviors in the past." Id. at ¶17.

The defendants assert that it is common for inmates to threaten self-harm. Id. at ¶20. At his deposition, the plaintiff agreed with counsel that it was common for inmates to shout out that they were going to harm themselves. Dkt. No. 80 at transcript page 60, lines 16-19. The plaintiff also points out that some of the inmates who say they're going to harm themselves do either hurt or kill themselves. Dkt. No. 103 at ¶20. The parties dispute whether the plaintiff ever exhibited symptoms consistent with imminent suicidal behavior during the dates relevant to this case—the defendants say that the plaintiff never exhibited symptoms "consistent with 'imminent suicidal behavior,'" dkt. no. 83 at ¶16, while the plaintiff says that he was "place in the IC[U] Room and the [ ] Emergency Room on dates in the complaint," Dkt. No. 103 at ¶16. The

4

defendants also assert that the plaintiff's acts of self-harm "presented a low risk of serious injury," dkt. no. 83 at ¶18, while the plaintiff reiterates that he was in the emergency room and the ICU room, which he says means he was at high risk of harm, dkt. no. 103 at ¶18. The defendants say that the plaintiff has engaged in self-harm "for reasons other than suicidal ideation, including when he is 'mad' at staff," dkt. no. 83 at ¶23, and the plaintiff doesn't dispute this,[2] emphasizing that he has serious mental illnesses that can't be treated with medication, dkt. no. 103 at ¶23.

The plaintiff is on a Behavioral Management Plan (BMP), which defendant Dr. Van Buren prepared. Dkt. No. 83 at ¶¶29-30. A BMP "is a non-punitive and multidisciplinary written plan to address inmate behaviors that threaten the inmate or others, impair the safe and secure operation of the facility, or result in disciplinary action." Id. at ¶30. The plaintiff was on a BMP "due to a history of multiple observation placements as a result of reports of self-harm/suicidal thoughts, self-injurious behavior, and threats of self-harm or suicide." Id. He also had "a history of seeking contact with the PSU crisis clinician by making statements about suicide/self harm but then denying or recanting those statements when seen immediately by PSU staff." Id. He also has a history of "engaging in sexual misconduct and becoming fixated on female staff." Id. The plaintiff disputes becoming fixated on female staff,

---

[2] In another response to the defendants' proposed findings of fact, however, the plaintiff disputes that he made allegations against staff when he was angry. Dkt. No. 103 at ¶30.

5

seeking contact with the PSU crisis clinician and making allegations against staff when he's angry. Dkt. No. 103 at ¶30.

B.  <u>Treatment History</u>

Between December 2016 and July 31, 2017, PSU staff saw the plaintiff seventy-five times. Dkt. No. 83 at ¶36. The defendants say that least twenty-one of those interactions occurred while the plaintiff was on observation status, <u>id.</u> at ¶37, while the plaintiff says that he doesn't recall those records, dkt. no. 103 at ¶36. Of those interactions, none were with defendant Dr. Steven Schmidt, and there is no record of a Psychological Services Request that references Schmidt.[3] <u>Id.</u> at ¶38. The defendants assert that the plaintiff never told Schmidt about stockpiling pills or that he was planning to take them to overdose. <u>Id.</u> at ¶39. The plaintiff identifies "incident reports" involving prior suicide attempts, that he says would have put the defendants, including Schmidt, on notice of his history of suicide and overdose attempts. Dkt. No. 89 at ¶7; Dkt. No. 90-1 at 1-3 (indicating that a December 5, 2016 threat to swallow pills was referred to Schmidt), 4-6 (indicating that a December 27,

---

[3] In his response to the defendants' proposed findings of fact, the plaintiff states that he wrote Dr. Schmidt and that Schmidt was the supervisor and oversaw the treatment of inmates. Dkt. No. 103 at ¶38. He provided no citation to admissible evidence that shows he wrote to Schmidt. The fact that Schmidt was a supervisor (again, the plaintiff does not present evidence of this) does not create liability. To be liable under §1983, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." <u>Hildebrandt v. Ill. Dept. of Nat. Resources</u>, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting <u>Gentry v. Duckworth</u>, 65 F.3d 555, 561 (7th Cir. 1995)).

6

2016 threat to swallow pills was referred to Schmidt), 7-9 (indicating that a February 7, 2017 incident where the plaintiff claimed to have bitten himself/cut himself with a razor was referred to Schmidt), 10-12 (indicating that a March 11, 2017 allegation that the plaintiff had taken pills was referred to Schmidt). The plaintiff did not see defendant Dr. Kessler after September 29, 2016, months before the relevant events (the events the plaintiff alleges in the complaint took place in early 2017), dkt. no. 83 at ¶40, and the plaintiff points out that Kessler admitted in his response to the plaintiff's requests for admission that he was aware of the plaintiff's history of overdosing, dkt. no. 89 at ¶12; dkt. no. 90-1 at 21.

C.    Crushed Pill Restriction/January 15, 2017 overdose

The plaintiff asserts that on January 14, 2017, defendant Dr. Salem Syed prescribed the plaintiff "IBU 800 MG." Dkt. No. 89 at ¶9; Dkt. No. 90-1 at 16.[4] The plaintiff claims that two days prior, Syed had placed him on a crushed medication restriction due to his history of overdoses. Dkt. No. 90 at ¶2. The plaintiff asserts that on January 15, 2017, he overdosed. Dkt. No. 89 at ¶9. The plaintiff says that around January 19, 2017, defendant Anne York was doing rounds. Dkt. No. 90 at ¶3. He says that when he asked about his crushed medication, York told him that Syed removed the restriction and put him back on whole pills. Id. At his deposition, the plaintiff opined that knowing

---

[4] The plaintiff asserts that the document at Dkt. No. 90-1, page 16 shows that Dr. Syed prescribed this medication. That document is a "Prescriber's Orders" form, but the notations on it are illegible to the court. The defendants, however, do not dispute that Syed prescribed IBU 800 MG. Dkt. No. 110 at ¶9.

7

his history of overdoses, York "should have talked to Dr. Syed and asked him why he was taking away the crushed medication, knowing the fact that [the plaintiff] most likely will OD again and continue to OD off whole pills." Dkt. No. 80 at transcript page 21, lines 23-24; transcript page 22, lines 1-4.

> D.     February 7, 2017 Incident

The plaintiff testified at his deposition that on February 7, 2017, he took approximately thirty acetaminophen pills in the presence of defendant Van Buren. Id. at transcript page 23, lines 1-9. He testified that Van Buren was at his cell in response to a Psychological Care Request that the plaintiff submitted the night before. Id. at transcript page 23, lines 12-22. He indicated that he'd collected acetaminophen after the January 15, 2017 overdose. Id. at transcript page 22, line 25; transcript page 23, lines 1-3. The plaintiff said that he talked with Van Buren "probably like a minute," then he started taking the pills, id. at transcript page 25, lines 10-15, and he said that Van Buren immediately called for help, id. at transcript page 25, lines 16-19. A couple of officers came to the plaintiff's cell. HSU saw him immediately and placed him on observation status. Id. at ¶27. The plaintiff admitted at his deposition that between January 15, 2017 and February 7, 2017, he was "on cuff" for medications. Dkt. No. 80 at transcript page 27, lines 12-15. He claims, however, that officers didn't cuff him for the medications. Dkt. No. 103 at ¶31. The defendants don't dispute that Van Buren was aware of the plaintiff's previous overdose attempts. Dkt. No. 110 at ¶7.

The plaintiff wrote to defendant Chrystal Marchant, who he knew from his time at another institution, and defendant Nancy White to tell them that the security staff was not cuffing him for his medications. Dkt. No. 83 at ¶¶32, 34; Dkt. No. 89 at ¶3. Marchant wrote him back and expressly noted that security was obligated to follow restrictions related to medication. Id. at ¶33. White also wrote back to him. Dkt. No. 83 at ¶34. The plaintiff never told Marchant and White that he had stockpiled pills he planned to take. Id. at ¶35.

E.    Prison Official Defendants

Defendants Warden Brian Foster, Deputy Warden Sarah Cooper and Security Director Tony Meli have supervisory positions at the prison. Dkt. No. 83 at ¶41. The plaintiff believes that they were aware of "every incident" involving him based on their job positions. Id. They do acknowledge they knew of his prior overdoses. Dkt. No. 89 at ¶7. The plaintiff agreed that Foster's knowledge was all after-the-fact, since the warden is the one who signs off on the order(s) allowing an inmate to transfer from the prison to a hospital. Dkt. No. 83 at ¶¶43-44. Foster also signed off on offender complaints the plaintiff appealed. Id. at ¶45. The two generally had a good rapport, and the plaintiff testified at his deposition that Foster tried to help him out. Id. at ¶46.

The plaintiff wrote Cooper on occasion, but he never told her that he had a plan to overdose or that he was hoarding pills to overdose. Id. at ¶47. With respect to Meli, the plaintiff believes Meli was responsible for extending the cuff-for-medication restriction. Id. at ¶49. He also testified at his deposition

9

that he believes Meli should have intervened in some way—by saying to stop to the pills, taking away the medication, or crushing the medications. Id. at ¶48.

The plaintiff never told Foster, Cooper or Meli that he planned to harm himself on a specific date. Id. at ¶50.

### F. March 11, 2017 Self-Harm Incident

At the time of the March incident, the plaintiff's cell was near the front of the cell range and therefore very close to the sergeant station. Id. at ¶59. He could "see everything" and staff could hear his voice. Id. The plaintiff claims he yelled out to other inmates that he was going to take the pills before he did so. Id. The proposed fact does not give a timeline with respect to the plaintiff shouting out about overdosing. But at 10:35 a.m., the plaintiff told defendant Brian Wood that he planned to overdose but did not show Wood any pills. Id. at ¶51; Dkt. No. 89 at ¶5. At noon, defendant Carlyn M. Voigt was conducting controlled medication pass. Dkt. No. 83 at ¶52. Another inmate told Voigt that the plaintiff planned to overdose because another officer harassed him. Id. at ¶52. Shortly after noon, the plaintiff took the pills. Id. at ¶53. About thirty minutes later, the plaintiff stopped defendant Michael A. Clark and gave him an empty box of acetaminophen. Id. at ¶54; Dkt. No. 89 at ¶4. The plaintiff told Clark that his stomach hurt because he took the whole box. Dkt. No. 83 at ¶54. Clark told the plaintiff that he would tell Voigt and walked away. Id. Voigt sent defendant Ryan Detert to check on the plaintiff, and he arrived at 12:50 p.m. Id. at ¶55. The plaintiff told him what happened and Detert walked away. Dkt. No. 89 at ¶6. About ten minutes later, Voigt talked with the plaintiff for

10

about ten minutes about what happened. Dkt. No. 83 at ¶56. The plaintiff reported that Voigt told him she thought he was trying to get her to his cell so that he could masturbate in front of her. Id. at ¶57. The plaintiff denied that he was, but he admitted that he had masturbated in front of female staff as recently as a year before this incident. Id.

About forty minutes after the plaintiff told Clark about the pills, five security staff members (including Detert) came to his cell and asked if he would comply with orders to be removed from his cell. Id. at ¶58. The plaintiff complied. The officers took him to a strip search cell while others searched his cell. A nurse ran labs on pills found in the plaintiff's cell and the plaintiff was sent to the emergency room. Id. Once there, he reported mild nausea and mild abdominal discomfort, as well as feeling slightly drowsy. Id. at ¶65. Hospital staff admitted him for observation and he received fluids and anti-nausea medication. They discharged him the next day. Id.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute

11

over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Eighth Amendment Deliberate Indifference

The plaintiff is proceeding against all the defendants on a claim that they acted with deliberate indifference to his medical needs with respect to his medication and overdoses (on several occasions). Dkt. No. 45. The defendants moved for summary judgment for every defendant except defendants Syed and York. Dkt. No. 129 at 2 n.2. They believe that material issues of fact remain with respect to these defendants and, therefore, the January 15, 2017 incident and their involvement in the February 7, 2017 incident (in that removing the crushed medication restriction allowed the plaintiff to hoard pills). The plaintiff moved for summary judgment against all defendants. Dkt. No. 88 at 1.

12

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element—that the medical need be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. Id.

The defendants do not say whether they dispute that the plaintiff had a sufficiently serious medical need. They do not say (explicitly) if they characterize his overdoses as a suicide attempt. But they do cite the standard for suicide or suicide attempts, dkt. no. 129 at 6, so the court infers that they characterize the overdoses as suicide attempts, and the court will apply that standard. To show deliberate indifference to medical needs in the case of suicide or a suicide attempt, the subjective element (a sufficiently culpable state of mind) of the claim requires a dual showing "that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010) (internal quotations and citations omitted).

1.    *Dr. Van Buren*

The plaintiff believes that Dr. Van Buren should be held liable because she was aware of his history of overdosing and did not act to "correct the care." Dkt. No. 88 at 9. At his deposition, the plaintiff testified that they had talked about his history of overdosing and that "[Van Buren] never gave [him] the

13

correct solution of why [he] should stop doing it or why [he] shouldn't do it at all." Dkt. No. 90 at 26. The plaintiff believes that "[Van Buren] had plenty of time to figure out some way to . . . [make] sure that [he wouldn't] be able to overdose or harm [himself]." Id. But Van Buren cannot be found liable for failing to find a way make the plaintiff's mental health struggles disappear.

The plaintiff received mental health care preceding the February 7, 2017 incident. He was on a cuff restriction (it's not clear who ordered this restriction), and the record indicates that the guards (who are not defendants) failed to properly cuff him despite that restriction. Dkt. No. 83 at ¶31. The cuff restriction required that the plaintiff be cuffed to the door to receive medication. Dkt. No. 80 at 26–27.  Neither party explains how this restriction would prevent the plaintiff from hoarding pills and overdosing. Assuming it did, the guards' failure cannot be imputed to the officials who ordered the restriction. Also, the PSU saw the plaintiff seventy-five times over the course of eight months between December 2016 and the end of July 2017. Id. at ¶37. Van Buren's inability to rid him of suicidal or self-harm tendencies is not a basis for find that she disregarded a risk that the plaintiff might attempt suicide.

Van Buren acted reasonably when the plaintiff started taking pills in front of her on February 7, 2017. She cannot be liable for failing to prevent him from taking the pills—she was standing in front of him when he did it. Id. at ¶26. The plaintiff did not tell her he planned to take them, id. at ¶27, and she immediately called for help, id. at ¶26. The plaintiff believes that Van Buren

*should* have known he was at risk because he'd overdosed in the past. But that is not enough. <u>Pittman ex rel. Hamilton v. Cty. of Madison, Ill.</u>, 746 F.3d 766, 777 (7th Cir. 2014). Instead, the defendant must be "aware of the facts from which the inference could be drawn that there was substantial risk of suicide and must also draw that inference." <u>Id.</u> There is no evidence that, as Van Buren stood before the plaintiff, she was aware of facts that would lead her to infer that he was at substantial risk of suicide at that moment. Van Buren is entitled to summary judgment.

### 2. *Dr. Schmidt and Dr. Kessler*

The plaintiff sued Dr. Schmidt and Dr. Kessler because, as supervisory doctors, they were aware of his history and (he alleges) ignored the risk to his health and safety. Dkt. No. 88 at 9. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. <u>Burks v. Raemisch</u>, 555 F.3d 592, 595-96 (7th Cir. 2009). Supervisors cannot be liable just because they are supervisors; they must be personally involved in the constitutional deprivation. <u>Matthews v. City of E. St. Louis</u>, 675 F.3d 703, 708 (7th Cir. 2012) (quoting <u>Chavez v. Ill. State Police</u>, 251 F.3d 612, 651 (7th Cir. 2001)). There is no evidence that Schmidt ever treated the plaintiff. Dkt. No. 83 at ¶38. There is no evidence that the plaintiff submitted any psychological services request referencing Schmidt. <u>Id.</u> There is no evidence that Schmidt knew the plaintiff was stockpiling pills (at any time). <u>Id.</u> at ¶39. Schmidt had no personal involvement with any of the plaintiff's overdoses relevant to this lawsuit and he is entitled to summary judgment.

15

Kessler also is entitled summary judgment. Though he had seen the plaintiff in the past, the last time was September 29, 2016. Id. at ¶40. The first overdose occurred in January 2017. As with Schmidt, there is no evidence that Kessler was personally involved with the plaintiff or his care preceding any of the overdoses in this lawsuit.

### 3. *Health Services Unit Managers Marchant and White*

The plaintiff is suing Marchant and White because he wrote to them about officers not cuffing him to the door for medication. Dkt. No. 88 at 8. Both wrote him back, dkt no. 83 at ¶¶33-34, and Marchant told him that security was obligated to follow restrictions with respect to medications, dkt. no. 33. As the court explained above, only prison officials who are personally responsible for a constitutional violation are held to be liable under §1983. Burks, 555 F.3d at 595-96. The plaintiff seeks to hold Marchant and White liable for someone else's misdeeds by arguing that they knew the security officers were not following the cuff restriction. But prisoners are not entitled to insist one prison official do another official's job. Id. at 595. Marchant and White are HSU managers. They are not liable for others' failure to properly cuff the plaintiff. They "do not have a free-floating obligation to put things to rights." Id.

There also is no evidence that Marchant or White had any reason to know that the plaintiff hoarded pills and planned to take them to overdose, with respect to any of the incidents. There were no facts of which they were aware from which they could infer that the plaintiff was at a substantial risk of

16

suicide. <u>Pittman</u>, 746 F.3d at 777. Both Marchant and White are entitled to summary judgment.

4.    *Supervisory Defendants*

The plaintiff sued Foster, Cooper and Meli, again arguing that, as supervisors who knew of his history of self-harm and suicide attempts, they failed to protect him from harm. Dkt. No. 88 at 8. At the risk of excessive repetition—supervisors are not liable just because they are supervisors. Foster, Cooper and Meli are liable only if they were personally involved in the alleged constitutional violations. <u>Burks</u>, 555 F.3d at 595-96. This means they needed to be aware of facts that would allow them to infer that the plaintiff was at risk of suicide. <u>Pittman</u>, 746 F.3d at 777. There is no evidence that the plaintiff told any of these defendants about any of his plans to hoard medication and overdose.

While Foster, as the warden, signs off on the orders transferring an inmate to a hospital, dkt. no. 83 at ¶43, this gives him knowledge of the overdose only after the fact. There is no proof that *before* the plaintiff overdosed and was taken to the hospital, Foster had any knowledge of what the plaintiff planned to do. And though the plaintiff wrote to Cooper, he does not allege that that he told her of his plans to overdose. <u>Id.</u> ¶47. As for Meli, the plaintiff believes that Meli was responsible for extending the cuff restriction for medication. <u>Id.</u> at ¶49. But that shows, not that Meli was deliberately indifferent to the risks the plaintiff faced, but that Meli acted to protect the

17

plaintiff from that risk. Foster, Cooper and Meli are entitled to summary judgment.

### 5. *March 11, 2017 Incident*

The plaintiff is suing defendants Wood, Voigt, Clark and Detert for the way they responded to his March 11, 2017 overdose. Dkt. No. 88 at 1, 8-9; Dkt. No. 45 at 4. At around 10:35 a.m., the plaintiff told Wood he was going to overdose but did not show him any pills. Dkt. No. 83 at ¶51. At noon, another inmate told Voigt that the plaintiff planned to overdose. Id. at ¶52. Shortly after that, the plaintiff took the pills. Id. at ¶53. At 12:30 p.m., the plaintiff told Clark that he took a whole box of acetaminophen, and Clark told the plaintiff he'd tell Voigt. Id. at ¶54. Voigt sent Detert to check on the plaintiff, and Detert arrived around 12:50 p.m.. Id. at ¶55. About ten minutes later, Voigt arrived to talk to the plaintiff. Id. ¶56. By 1:15 p.m., security arrived at the plaintiff's cell and ultimately he was taken to the emergency room. Id. at ¶58.

The defendants explain that the plaintiff stated that he shouted out to other inmates about taking pills, and the plaintiff said it's common for inmates to do this and to complain about staff. Dkt. No. 129 at 17-18. He testified that it depends on who's working. Id. (citing Dkt. No. 83 at ¶¶60–63.) The court infers that the defendants might believe that the plaintiff's statement to Wood was not credible, but they never make that argument. They make no argument about Wood at all. Instead, they argue that if the defendants had been indifferent to the plaintiff, they would not have promptly reported to his cell or arranged for medical care. Dkt. No. 129 at 19. As far as the court can tell,

18

Wood did neither of those things. There is no record of what Wood did other than hear the plaintiff say he was going to overdose and then walk away. Because the record contains no facts about what Wood did or did not do, summary judgment is not appropriate with respect to Wood.

The court will, however, grant summary judgment for Voigt, Clark and Detert (though not because the defendants made a strong argument about why they are entitled to it). As far as the court can tell, Detert's only involvement was coming to the plaintiff's cell at Voigt's direction to find out what happened. Dkt. No. 83 at ¶55. There is nothing he could have done to prevent the plaintiff from taking the pills, and there is nothing in the record to suggest there was other action he should have taken after coming to the plaintiff's cell. This is also true for Clark, to whom the plaintiff reported he'd taken the pills. Upon hearing this, Clark reported it to Voigt, who then sent Detert. The plaintiff argues that Clark should not have left from in front of his door, but he does not say why. Dkt. No. 88 at 9. He also does not say what Clark could have accomplished by staying at his door rather than going to talk to Voigt. Clark could not go into the plaintiff's cell. Dkt. No. 83 at ¶6. And the plaintiff reported only that his stomach hurt; he didn't report any more urgent symptoms. Id. at ¶54. Neither Detert nor Clark acted with a sufficiently culpable state of mind— something close to recklessness. Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) (internal citation omitted). They are entitled to summary judgment.

The only thing that distinguishes Voigt from Detert and Clark is that another inmate told her that the plaintiff planned to overdose while she was

doing medication pass. Dkt. No. 83 at ¶52. Perhaps the defendants' explanation that inmates call out to each other about intending to harm themselves provides context to Voigt's experience, but the defendants don't say that. Regardless, the court finds that Voigt's failure to act when another inmate told her the plaintiff said he was going to overdose was not reckless. It did not show "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." Rosario v. Brawn, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations and citation omitted). According to the record—and according to the plaintiff—it is not uncommon for inmates to shout out such threats, and whether they do can depend on who's working. Dkt. No. 83 at ¶¶62–63. In this context, Voight's having heard from a third party, and not from the plaintiff, that the plaintiff shouted about overdosing does not show that Voigt had a sufficiently culpable state of mind to evince deliberate indifference to the plaintiff.

    The plaintiff also seems to contend that the amount of time it took for him to get treatment (the court assumes he is referring to being taken to the hospital) was deliberately indifferent. Dkt. No. 88 at 9. From the time the plaintiff told Clark about the pills to the time the security officers came to move him out of his cell, approximately forty-five minutes passed. Dkt. No. 83 at ¶¶54, 58. Neither party says how long after that it took for the pills to be tested and the plaintiff to be transferred to the hospital (except that the plaintiff says it was an hour or more from the time he told Clark). Dkt. No. 88 at 9. The plaintiff neither alleges that any of the defendants purposefully protracted the

process nor alleges that he suffered any harm as a result. The amount of time it took to get the plaintiff to the hospital did not constitute deliberate indifference.

C.   Dr. Syed and York

The defendants have not moved for summary judgment with respect to defendants Dr. Syed or York. Dkt. No. 129 at 2 n.2. The plaintiff has. Dkt. No. 88 at 1, 7. As best the court can tell, Syed placed the plaintiff on a crushed medication restriction due to his overdose history. Dkt. No. 90 at ¶2. A few days later, the plaintiff overdosed. Dkt. No. 89 at ¶9. On January 19, 2017, defendant York told the plaintiff Syed had removed the restriction. Dkt. No. 90 at ¶3. As the court understands it, the plaintiff hoarded enough pills to overdose again on February 7, 2017. The record is underdeveloped, and it's not possible for the court, taking the facts in the Syed's and York's favor, to find as a matter of law that either of them acted with deliberate indifference to the plaintiff's risk of suicide. The court will deny the plaintiff's motion for summary judgment as to Syed and York.

D.   Qualified Immunity

The defendants also argue that all defendants, including Syed and York, are entitled to qualified immunity. Dkt. No. 129 at 19–21. "Whether an official is entitled to qualified immunity on a motion for summary judgment turns on whether the plaintiff has both (1) alleged that the official committed acts violating a clearly established right and (2) adduced 'evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts.'"

21

<u>Balsewicz v. Pawlyk</u>, Case No. 19-3062, 2020 WL 3481688, at *4 (7th Cir. June 26, 2020) (quoting <u>Mitchell v. Forsyth</u>, 472 U.ZS. 511, 526 (1985)).

The court need not reach this question for the defendants entitled to summary judgment in their favor. The defendants appear to concede that there are genuine issues as to Syed and York, and the court has concluded that there are genuine issues as to what Wood did or did not do after the plaintiff said he was going to overdose. And if these officials did act with deliberate indifference to the plaintiff's threats of, or risk of, self-harm, their actions violated a clearly established right. The remaining defendants are not entitled to qualified immunity.

## III.   CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 87.

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 128. The court **GRANTS** summary judgment in favor of defendants Foster, Cooper, Meli, White, Marchant, Voigt, Detert, Clark, Kessler, Van Buren and Schmidt. The court **DENIES** summary judgment for Wood.

The court **DISMISSES** Foster, Cooper, Meli, White, Marchant, Voigt, Detert, Clark, Kessler, Van Buren and Schmidt.

The plaintiff has represented in another case pending before the court that he is amenable to mediation, and defense counsel has agreed that once

the court issues this decision, the defendants will notify the court whether

they, too, are willing to mediate. The court awaits word from defense counsel.

Dated in Milwaukee, Wisconsin, this 2nd day of July, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**